LAW OFFICES OF AMY N. TIRRE,
A Professional Corporation
AMY N. TIRRE, ESQ.  #6523
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 828-0909 Telephone
(775) 828-0914 Facsimile
E-mail:  amy@amytirrelaw.com

E-Filed:   November 7, 2011

Counsel for Tri-State Livestock Credit Corporation

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>DOUBLE U LIVESTOCK, LLC,<br><br>Debtor. | Case No. BK-N-11-52345<br><br>Chapter 12<br><br>**TRI-STATE CREDIT CORPORATION'S OBJECTION TO DEBTOR'S CHAPTER 12 PLAN**<br><br>Hearing Date:  November 21, 2011<br>Hearing Time: 10:30 a.m.<br>Est. Hearing Time:  1 hour |

Secured Creditor Tri-State Livestock Credit Corporation, a California corporation ("Tri-State"), by and through its undersigned counsel, hereby files its objection to Debtor Double U Livestock, LLC's Chapter 12 Plan, filed on October 19, 2011 as Docket No. 47 and the Notice of Amendments to Chapter 12 Plan, filed on November 2, 2011 as Docket No. 68 with the attached exhibits.  This Objection is supported by the following Memorandum of Points and Authorities, the concurrently-filed Declaration of Robert Bergsten (the "Bergsten Declaration"), all pleadings and papers of record, and any oral arguments of counsel at the hearing on this matter.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Debtor's Chapter 12 Plan should not be confirmed because:  (1) Debtor is ineligible for relief under Chapter 12 because its debts exceed the debt limit of $3,792,650 as set forth in 11 U.S.C. §101(18)(B); (2) Debtor's Chapter 12 Plan is not feasible as required by 11 U.S.C. §1225(a)(6); (3) the proposed treatment of Tri-State's secured claim does not comport with the requirements of 11 U.S.C. §1225(a)(5)(B) on the grounds that it, inter alia, extends a fully-matured 1-year term loan for 30 years, which is unreasonable and it provides for negative

-1-

amortization over the 11 years; (3) the proposed cramdown interest rate does not adequately compensate Tri-State as required by 11 U.S.C. §1225(a)(5)(B)(ii); and (4) Tri-State is not being adequately protected for the use of its collateral during the term of the plan and beyond.

## II.   RELEVANT FACTS AND BACKGROUND

### A. Loan and Documents

On or about February 19, 2008, Debtor and Tri-State entered into a Renewal Promissory Note in the principal amount of $1,518,363.00 payable to Tri-State, executed by James A. West, Carleen J. West, Clayton J. West, Mary West, Wade S. West and Molly West, in their capacities as members of the Debtor as well as individually. A copy of the Renewal Promissory Note is attached to concurrently filed Bergsten Declaration as **Exhibit 1.**

The relationship of the debtor and Tri-State started in late 2002 and the first loan was made in early 2003. Bergsten Declaration at ¶4. At that time, Debtor was moving its operation from Oregon to Nevada and Tri-State was willing to provide an operating loan for operations that was secured by only personal property at the beginning, but would eventually be additionally secured by real and BLM leasehold property. *Id.* Tri-State's lien is in second position behind the Paris Trust on a part of the real property and in first position on another part of the real property. *Id.* The Renewal Promissory Note is the fifth renewal (sixth loan) to Debtor; the renewal loans were usually renewed in increasing amounts to advance funds to Debtor due to operating losses and a need for capital improvements to ostensibly be able to increase the future cash flow and success. As set forth below, there was cash flow improvement in 2008 through 2010, but not enough to adequately service the growing magnitude of the total debt. Tri-State's first loan to Debtor was evidenced by a note dated January 14, 2003 in the amount of $175,000.00. *Id.*

On February 19, 2008, a Loan Agreement was executed in favor of Tri-State executed by James A. West, Carleen J. West, Clayton J. West, Mary West, Wade S. West and Molly West, in their capacities as members of the Debtor as well as individually. A copy of the Loan Agreement is attached to the concurrently filed Bergsten Declaration as **Exhibit 2.**

Tri-State is secured by a Deed of Trust, Assignment of Rents, and Security Agreement dated February 26, 2007, recorded as Document No. 572088 on April 27, 2007, in the Elko County Recorder's Office, against Debtor's real property located in Elko County with APN 007-160-015. A true and correct copy of the Deed of Trust is attached to the Bergsten Declaration as Exhibit 3.

Tri-State is secured by a Deed of Trust, Assignment of Rents, and Security Agreement

dated February 26, 2007, recorded as Document No. 337216 in Book No. 473 at Page No. 493 on April 27, 2007, in the White Pine County Recorder's Office, against Debtor's real property located in White Pine County with APNs 008-230-001 through -003 and APN 008-240-001. A true and correct copy of the Deed of Trust is attached to the Bergsten Declaration as **Exhibit 4.**

Tri-State is secured by a Deed of Trust, Assignment of Rents, and Security Agreement dated February 26, 2007, recorded as Document No. 0128841 in Book No. 231 at Page No. 0038 on April 27, 2007, in the Lincoln County Recorder's Office, against Debtor's real property located in Lincoln County with APN 010-220-02. A true and correct copy of the Deed of Trust is attached to the Bergsten Declaration as **Exhibit 5.**

The parties entered into a Security Agreement dated February 19, 2008, whereby Debtor granted to Tri-State a security interest in, inter alia, all Debtor's crops, farm products, equipment, inventory, accounts, documents, chattel paper, instruments, contracts, and general intangibles now owned or hereafter acquired; all livestock, interest in livestock or its born or unborn progeny, leasehold interests in livestock, and all livestock feed, now owned or hereafter acquired by the Debtor, including but not limited to additions, replacements and increases; and all equipment, feed, hay, grain, fodder, ensilage, chemicals, fertilizers, medicines and supplies used in Debtor's farming or livestock operations now located or hereafter to be located on properties owned or leased by the Debtor; and all products of the above collateral and all proceeds from sale of said collateral or products ("Personal Property Collateral").  A true and correct copy of the Security Agreement is attached to the concurrently filed Bergsten Declaration as **Exhibit 6.**

Tri-State perfected its security interest in the Collateral by filing a UCC-1 Financing Statement with the Nevada Secretary of State's Office on January 29, 2003 as Document No. 2003002936-3, a UCC-1 Continuation Statement as Document No. 2007036260-8 on November 2, 2007 and an Amendment as Document No. 200770370361-7 on November 8, 2007. A true and correct copy of the UCC-1 Financing Statement and the Amendment are attached to the concurrently filed Bergsten Declaration as **Exhibits 7 and 8,** respectively.

### B. Payment History and Background

Tri-State has a first-priority security interest in all of Debtor's personal property assets, including its livestock (sheep), hay, leases, AUM's, and equipment.  Bergsten Declaration at ¶13  Tri-State has a second deed of trust against Debtor's real property.  Debtor has failed to make any payments to Tri-State in 2009 and 2010 despite the fact that the loan came due on January 6, 2009. *Id*.

-3-

As of the petition date, July 21, 2011, the amount of Tri-State's claim was $1,960,169.08, which consists of $1,542,651.14 in principal, $397,648.94 in accrued interest and $19,869 in expenses. Bergsten Declaration at ¶14. The interest rate is 7.75% per annum. *Id.* This 7.75% interest rate was adjustable and decreased from the note's initial interest rate of 9.25%. Tri-State, while it could have, has never invoked the plus 2% default rate option or the current accrual rate could now be 9.75%. Interest-only annual payments at 7.75% on the principal amount of $1,542,651.14 would be in the amount of $119,555.46. Interest only payments at 7.75% on the principal plus accrued interest plus expenses as of the day of filing would be $154,350.00. *Id.*

Over the years that the loan from Tri-State was renewed, Debtor's payments never approximated even an interest-only payment. Bergsten Declaration at ¶15. According to Mr. Bergsten, Debtor made a payment of $22,986.39 in 2005, $447,848.18 in 2006, $79,957 in 2007, and $9,087.38 in 2008. *Id.* Tri-State received <u>no</u> payments in 2009 and 2010. *Id.*

In fact, on March 31, 2011, Tri-State <u>advanced</u> the payment due to the holder of the first deed of trust against the Debtor's real property, Peter and Rama Paris Family Trust, in the amount of $104,628 so that it would not go into default. Bergsten Declaration at ¶17.

### III. REQUIREMENTS FOR CHAPTER 12 PLAN CONFIRMATION

Section 1225(a) governs the requirements for confirmation of a Chapter 12 plan and it provides as follows:

> **(a)** Except as provided in subsection (b), the court shall confirm a plan if—
>
> **(1)** the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
>
> **(2)** any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
>
> **(3)** the plan has been proposed in good faith and not by any means forbidden by law;
>
> **(4)** the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
>
> **(5)** with respect to each allowed secured claim provided for by the plan—
>
> **(A)** the holder of such claim has accepted the plan;
>
> **(B)**
>
> **(i)** the plan provides that the holder of such claim retain the lien securing such claim; and

LAW OFFICES OF AMY N. TIRRE
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 828-0909 Telephone
(775) 828-0914 Facsimile
E-mail: amy@amytirrelaw.com

-4-

**(ii)** the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

**(C)** the debtor surrenders the property securing such claim to such holder;

**(6)** the debtor will be able to make all payments under the plan and to comply with the plan; and

**(7)** the debtor has paid all amounts that are required to be paid under a domestic support obligation and that first become payable after the date of the filing of the petition if the debtor is required by a judicial or administrative order, or by statute, to pay such domestic support obligation.

## IV. ARGUMENT

### A. DEBTOR IS INELIGIBLE FOR CHAPTER 12 RELIEF BECAUSE THE TOTAL AMOUNT OF ITS DEBT EXCEEDS THE DEBT LIMIT OF $3,792,650

In order to be eligible for Chapter 12 relief, Debtor, which is an entity, must not have aggregate debts that exceed the amount of $3,792,650. 11 U.S.C. §109(f); §101(18)(B). Section 109(f) provides that "[o]nly a family farmer or family fisherman with regular annual income may be a debtor under Chapter 12 of this title." Debtor is a farmer because it derives more than 80% of its income from a "farming operation," which includes the raising of crops or livestock. 11 U.S.C. §§101(20),(21). Section 101(18)(B) defines "family farmer" as:

**(18)** The term "family farmer" means—

. . .

 **(B)** corporation or partnership in which more than 50 percent of the outstanding stock or equity is held by one family, or by one family and the relatives of the members of such family, and such family or such relatives conduct the farming operation, and
    **(i)** more than 80 percent of the value of its assets consists of assets related to the farming operation;
    **(ii)** <u>its aggregate debts do not exceed $3,792,650</u> and not less than 50 percent of its aggregate noncontingent, liquidated debts (excluding a debt for one dwelling which is owned by such corporation or partnership and which a shareholder or partner maintains as a principal residence, unless such debt arises out of a farming operation), on the date the case is filed, arise out of the farming operation owned or operated by such corporation or such partnership; and
    **(iii)** if such corporation issues stock, such stock is not publicly traded.

11 U.S.C. §101(18)(B) (emphasis added). This statute makes clear that a Chapter 12 debtor's aggregate debts may not exceed $3,792,650.

-5-

Here, Debtor's aggregate debts total in excess of $3,792,650 by Debtor's own admission and the claims identified in the claims register. Debtor's Plan identifies: $925,842 as the amount of the Class 1(a) claim ("Paris Family Trust"), $1,960,169 as the amount of the Class 1(b) claim (Tri-State's claim), $18,718 as the amount of the Class 1(c) claim, $11,821 as the amount of the Class 1(d) claim and $12,000 as the amount of the Class 1(e) claim and $120,000 as the amount of the Class 1(f) claim for a total of $3,048,550 in secured claims. See Docket No. 68-2 at 6 of 26 and Docket No. 68-1 at 6 of 9. Debtor's Schedule F identifies an unsecured debt owed to Mary West in the amount of $820,000 and the claims register shows that Mary West filed an unsecured proof of claim in the amount of $820,000, which is Claim #5, filed on October 17, 2011. See Docket No. 19 at p.15. This brings the total to $3,868,550, which exceeds the debt limit of $3,792,650 under 11 U.S.C. §101(18)(B). Accordingly, Debtor is ineligible for Chapter 12 relief and its Chapter 12 Plan cannot be confirmed.

Further, as detailed in the *Objection to Debtor Double U Livestock, LLC's Application to Employ White Law Chartered, John White, Esq., as Counsel for Debtor, Nunc Pro Tunc to July 21, 2011*, Docket No. 76, filed on November 4, 2011, the above-referenced claims do not include a $77,000 unsecured claim due to James A. West and Carleen West dba Sweetwater Ranch.

Tri-State will file a motion to convert to Chapter 7 or 11 and/or dismiss based upon Debtor's lack of eligibility to be heard concurrently with the hearing on Debtor's Plan.

**B. DEBTOR'S PLAN IS NOT FEASIBLE AS REQUIRED BY 11 U.S.C. 1225(a)(6)**

In order for this court to confirm Debtor's Chapter 12 Plan, Section 1225(a)(6) requires that "the debtor will be able to make all payments under the plan and to comply with the plan," i.e. that the plan be feasible. As detailed in the Bergsten Declaration Debtor's Plan is not feasible because: (1) its projected gross and net income uses "heroic assumptions" and leaves no room for any negative variance; (2) its categories of projected expenses omit necessary expenses such as additional necessary labor costs to run its operation, capital expenditures, income taxes, Chapter 12 Trustee fees, consulting fees to Mr. Fletcher; and (3) Debtor has poor management and there is no succession plan if the primary manager, Wade West, is incapacitated. Bergsten Declaration at ¶¶18-30.

**1. Lack of Feasibility with Respect to Debtor's Projected Income**

Debtor's Plan is based upon projected income and projected expenses. It is unclear how these projections relate to actual income and expenses because Debtor has failed to provide that

-6-

comparative information in Debtor's "Monthly Income, Monthly Expense, and Annual Net Income" projections are attached as spreadsheets to Debtor's Plan, including but not limited to, Tables B2011 through B2016.  See Docket No. 68-1 at 10-26.  Accordingly, it is very difficult to evaluate whether Debtor's projections are based upon its most recent actual income and expenses or are just heroic assumptions.

First, the feasibility of Debtor's Plan is suspect because Debtor's Plan does not clearly present the working cash position that the Debtor will have to start 2012.  On Table B2012, it presents starting cash of $25,000 on January 1, 2012, which, demonstrates by itself that there is insufficient cash to pay the proposed Plan payments as they come due because a $104,628 payment is due on March 31, 2012.  Table 2011 in the revised Plan (filed as Docket No. 68 on November 2, 2011), reflects Debtor's estimated December 31, 2011 ending cash of $126,647.  It is not clear if the $101,647 difference between ending cash of $126,647 and 2012 beginning cash of $25,000 is to be paid to Tri-State as proceeds of Tri-State's collateral.  It should be paid to Tri-State.  Nevertheless, even if Debtor is allowed to retain the $126,647, once other expenses are accounted for in the first quarter of 2012, Debtor will most likely have insufficient cash to make the $104,628 payment due to the Class 1(a) creditor in March 2012.

Second, Debtor's Plan overestimates its future income stream for 2012 through 2016.  Currently, the market price of lambs is high; lamb prices increased dramatically between 2010 and 2011 as reported in the October 2011 Sheep Industry News publication.  Bergsten Declaration at ¶21.  Lambs that Debtor recently sold in 2011 for about $2.41 per pound would have sold in 2010 for about $1.35 per pound.  *Id.* If Debtor's assumption regarding future lamb prices of $2.41 per pound were to fall back to 2010's price level of $1.35 per pound, Debtor's gross income would be 44% lower which equates to a decrease of $86,592, reducing the 2012 net income from $96,214 to $9,622.  *Id.* Due to the unpredictable vagaries of worldwide supply and demand for lamb meat, Debtor's projections for future lamb sale prices are high and not reasonable, thereby challenging the feasibility of Debtor's plan.

Third, Debtor's Plan proposes leasing real property for cattle grazing for a one-year term in 2012.  This also creates a significant risk factor and undermines feasibility because there is no long-term commitment by the lessee through the plan term, much less the 30-year term proposed for repayment of Tri-State's loan.  If this $125,000 of grazing income is not available in 2013, Debtor lacks any net operating income and will sustain a loss of $9,451 based upon Debtor's projections. Bergsten Declaration at ¶22.

-7-

Fourth, Debtor's projections regarding its hay production yields and future hay sale prices create problems for feasibility. Bergsten Declaration at ¶23. The hay yields have been poor and that is why the projection includes amounts for hay field redevelopment and fertilizer. There is risk that this redevelopment will not be successful and that weather will be adverse resulting again in poor hay yields and therefore reduced income. Debtor's assumption of $175 per ton for the future hay sales price reflects current market value and may not continue through the 5-year term of the Plan. Debtor's projection of hay income in the amount of $105,000 in 2012, for example, is a material portion of Debtor's cash income and if it is not there, then again the net operating income is dramatically reduced.

Fifth, Debtor's projections reflect an increasing number of ewe headage over the five-year term of the Plan. Bergsten Declaration at ¶24. If the headage does not increase, the plan is not feasible. As set forth in Table A1, Debtor expects to have 2,000 ewes in 2012 and to increase that number to 4,750 by 2016. This increase in headage is why Debtor's projected lamb income increases from $196,800 in 2012 to $587,350 in 2016. The ewe headage may not increase as projected due to birthing loss and open range grazing loss caused by weather, disease, and predators. *Id.* Debtor's projections for the lamb survival rates of 96% in 2012 and 100% in 2016 do not reflect reality; those survival rates are exceptional, even when Debtor is using its present system of shelter for initial lamb nurturing. *Id.* After the ewes and new born lambs are turned-out in early spring, they are still very vulnerable to the elements of bad weather, disease, and predators. *Id.* It is common knowledge that sheep are the least hearty of all domestic open range meat animals and when facing adversity are quite willing to die versus fight to live. *Id.* The open range vulnerability after birthing while baby lambs are still young is why it is necessary albeit expensive to have shepherds living 24/7 in the open range with every sheep herd using sheep dogs and sometimes lamas for predator protection. *Id.* The shepherds require the added expenses of worker's compensation, lodging, food, etc. and often visas, because they are, without exceptions, foreign immigrants. *Id.*

Ultimately, for a combination of the above reasons, if a 10% negative variance in Debtor's gross income is applied to Debtor's projections, which is a reasonable negative variance, Debtor's plan lacks feasibility. Bergsten Declaration at ¶25. In 2012, for example, a 10% reduction of Debtor's gross income is $50,780. *Id.* The result is that Debtor's net income is reduced to $45,434. This reduced net income makes it impossible to pay even Class 1(a) creditor its annual payment of $104,628. *Id.*

### 2. Lack of Feasibility with Respect to Debtor's Projected Expenses

Debtor's projected expenses are also problematic because Debtor has failed to include expenses that it will necessarily incur or will most likely incur. Bergsten Declaration at ¶26. First, Debtor has failed to include an expense for hiring a cowboy to take care of the lease cattle and/or to farm the hay. *Id.* Clay West used to manage the cattle care-taking, but he has relocated back to Oregon. *Id.* Jim West is perhaps over 80 years old and to Mr. Bergsten's knowledge, Jim West does not perform much of the hard labor required for the sheep operation. *Id.* Wade West is the member of the Debtor who has historically focused upon the management of the sheep operation and the hay farming; it will be difficult if not impossible for him to also manage the lease cattle. *Id.*

In addition, Debtor's projections regarding its future expenses are deficient because they are understated. Bergsten Declaration at ¶27. For example, Debtor's estimates for its legal and accounting fees, repairs, and capital expenditures are low. *Id.*

Further, Debtor's categories are simply missing key necessary expenses such as bookkeeping, Chapter 12 Trustee's fees, consulting fees for Robert Fletcher, vehicle replacement and income taxes. Bergsten Declaration at ¶28.

Another problem affecting feasibility is that Debtor has failed to account for any variance in its projections. Bergsten Declaration at ¶29. If a 10% increase in expenses were applied, which is reasonable, the increase in Debtor's expenses would reduce Debtor's net income by 23% which equates to $55,056 instead of $96,214 in net income for 2012. This net income is insufficient to service the Class 1(a) creditor annual payment due in the amount of $104,628. *Id.*

Finally, a critical problem is that Debtor's projected capital expenditures are insufficient for a going concern of this scope. Bergsten Declaration at ¶30. It is reasonable to expect that an operation of this scope will have annual capital expenditures to repair, maintain, and replace capital assets to maintain income earning ability. According to Mr. Bergsten, $50,000 per year for capital expenditures is a reasonable estimate. *Id.* Capital expenditures include rams, dogs, reseeding, ground work, irrigation equipment replacement, fences, tractor, hay baler, hay swather, corals, lambing sheds, herder lodging wagons, pickups, trucks, etc. *Id.* Many of these items are missing from Debtor's budget. *Id.* Debtor's 2012 projected budget has at most $24,000 that would fit into the capital expenditures category an estimate of $50,000 which is reasonable and necessary. *Id.*

*//*

### 3. Other Issues Affecting Feasbility

Debtor has demonstrated a track record of poor management since starting its operation in Nevada. Bergsten Declaration at ¶31. It has never been able to service Tri-State's debt. *Id.* Debtor's Chapter 12 Plan does not propose any changes to management. *Id.*

There is no back-up manager for Wade West in running the sheep operation. Bergsten Declaration at ¶32. According to Mr. Bergsten, Jim West is too aged for sheep management and he does not have the hands-on skills to do such work either. *Id.* Clay West was not a sheep manager and likely would not come back to Nevada from Oregon to run Debtor's sheep operation in the event of Wade West's incapacitation. *Id.* According to Mr. Bergsten, while it would increase the expense, the creditors would be well-served to have a life insurance policy on Wade West. *Id.* Wade West's disability would be almost as bad as his death as he could then not run the operation and at the very least would have to hire labor costing much more than his proposed salary in the Debtor's projected budget. *Id.*

Based upon the foregoing, Debtor's plan is not feasible and does not satisfy the requirement of Section 1225(a)(6) for confirmation. Thus, confirmation should be denied.

### C. THE PROPOSED TREATMENT OF TRI-STATE'S SECURED CLAIM DOES NOT SATISFY SECTION 1225(a)(5)(B)

Section 1225(a)(5) provides for the permissible treatment of a secured claim in a Chapter 12 plan as follows:

> **(5)** with respect to each allowed secured claim provided for by the plan—
>
> **(A)** the holder of such claim has accepted the plan;
>
> **(B)**
>
> **(i)** the plan provides that the holder of such claim retain the lien securing such claim; and
>
> **(ii)** the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or
>
> **(C)** the debtor surrenders the property securing such claim to such holder.

Here, Debtor proposes to cramdown Tri-State's Class 1(b) secured claim under Section 1225(a)(5)(B) by issuing it a new promissory note in the amount of $1,960,169 with simple interest to accrue at a rate of 5.25% to be amortized and paid out over <u>30 years</u> with no payments in 2012 and 2013, and with partial payments in 2014 and 2015. Docket No. 68-1 at 3-4; Docket No. 68-2 at p. 8 of 26; and Tables C4 and C5 in Docket No.68-2 at pp. 25 and 26.

LAW OFFICES OF AMY N. TIRRE
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 828-0909 Telephone
(775) 828-0914 Facsimile
E-mail: amy@amytirrelaw.com

-10-

Debtor's proposed treatment of Tri-State's secured claim is impermissible because: (1) it provides for negative amortization of Tri-State's claim for 11 years; (2) a 30-year payment term is unreasonably long given the circumstances of this case; and (3) the proposed 5.25% interest rate is too low to provide Tri-State with the present value of the allowed amount of its claim.

### 1. Negative Amortization is Impermissible

Debtor freely admits that its plan provides for negative amortization of Tri-State's secured debt. Docket No. 68-2 at p.8 of 26. For the first two years, no payments will be made to Tri-State and instead interest will be deferred and allowed to accrue, with accrued interest added to principal. For the third and fourth year, Tri-State will only receive partial payments and not fully-amortized payments. In fact, according to Debtor's Table C-4, Docket No. 68-2, using Debtor's proposed payment schedule, it will take **11 years** before the balance of Tri-State's loan will reach its principal balance of $1,960,169 because so much interest will be allowed to accrue. This negative amortization shifts significant risk to Tri-State.

In *Great Western Savings Bank v. Sierra Wood Group (In re Sierra Woods Group)*, 953 F.2d 1174, 1177-78 (9th Cir. 1992), the Ninth Circuit held that while negative amortization is not per se unfair and inequitable, courts have reservations about the practice and the permissibility of negative amortization should be determined on a case-by-case basis. The court cited to a non-exhaustive list of factors as appropriate for the evaluation:

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

LAW OFFICES OF AMY N. TIRRE
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 828-0909 Telephone
(775) 828-0914 Facsimile
E-mail: amy@amytirrelaw.com

10. Are there adequate safeguards to protect the secured creditor against plan failure.

*In re Sierra Woods Group*, 953 at 1178 (citing *In re Apple Tree Partners, L.P.,* 131 B.R. 380, 395 (Bankr.W.D.Tenn.1991)). Moreover, the court in *Sierra Woods* cited to a large number of cases where the respective courts found that negative amortization was not fair and equitable under the circumstances and noted that the only case where a negative amortization plan was confirmed involved an underlying contract allowing for negative amortization. *Id.* at 1177 (citing *In re Club Associates,* 107 B.R. 385, 398 (Bankr.N.D.Ga.1989)).

Here, Debtor's Plan fails to establish the foregoing factors to justify negative amortization. First, Debtor's plan offers a 5.25% rate of interest, which Debtor fails to demonstrate is a market rate of interest under *Till*. Second, the length of the deferral is 30 years when the original term of the loan was one year. Third, Debtor's financial projections are problematic and insufficiently proven as detailed above. Fourth, Tri-State's collateral includes the livestock and a second deed of trust against Debtor's real property; there are significant risks of depreciation for the livestock due to birthing loss and death and the fact that values of real property in Northern Nevada continue to decline. Sixth, the Plan shifts all risk to Tri-State and none of the other secured creditors. Seventh, the Plan precludes foreclosure for 30 years without any payments for the first two years. Eighth, the original loan terms <u>do not</u> provide for negative amortization. Ninth, there are inadequate safeguards to protect Tri-State against plan failure because Debtor will most likely default on the payment on its payment to the Class 1(a) creditor, the Paris Family Trust, which will allow it to foreclose and wipe out Tri-State's second deed of trust without providing Tri-State any remedy.

Accordingly, confirmation of Debtor's Plan providing for negative amortization should be denied.

**2. A 30-Year Payment Term is Unreasonable**

Pursuant to Section 1222(b)(9), a Chapter 12 plan may provide for payment of allowed secured claims over a period exceeding the three- to five-year period imposed by Section §1222(c). The Bankruptcy Code offers no guidance as to the maximum acceptable length of time within which a debtor must pay off a secured claim. *Matter of Rose*, 135 B.R. 603 (Bankr. N.D. Ind. 1991) (citing 5 L.King Collier on Bankr. ¶1225.03[4][a] at 1225–17 (1990)). The bankruptcy court itself is left to resolve this issue based on the facts of the case. *Id*. In determining the maximum acceptable length of time for extending a debtor's obligations to a secured creditor under a plan, courts have required debtors to support their proposals to lengthen the time for repaying

-12-

obligations by presenting "evidence of reasonableness, customary lender practices, [and] market standards" in addition to showing that their proposal provides the secured creditors with the mathematical present value of their claims. *Id.* (citing *In re Koch*, 131 B.R. 128 (Bankr. N.D. Iowa 1991)). In *Matter of Rose*, 135 B.R. 603 (Bankr. N.D. Ind. 1991), the bankruptcy court held that a 30-year time period for the payment of the secured loan in that case was unreasonable after analyzing the foregoing factors.

In *In re Koch*, 131 B.R. 128 (Bankr. N.D. Iowa 1991), the bankruptcy court engaged in a thorough analysis of whether a 30-year payment term was permissible and concluded that it was not based upon the customary lender practices and market standards. In its analysis, the court looked to other cases analyzing whether such an extended payment term provided the secured creditor with the present value of the secured creditor's claim and constituted "fair repayment:"

> Other courts, however, have read "fair repayment" under § 1225(a)(5)(B) more narrowly in finding that there are limitations on the length of the repayment which can be imposed on secured claimants in Chapter 12. *In re LLL Farms,* 111 B.R. 1016, 1022 (Bankr.M.D.Ga.1990); *In re Foster,* 79 B.R. 906, 910–11 (Bankr.D.Mont.1987); *In re Smith,* 78 B.R. 491, 494 (Bankr.N.D.Tex.1987). These courts have interpreted § 1225(a)(5)(B) to account for more than bare mathematical present value analysis. For example, in *LLL Farms,* the court found that where the lender, the Georgia Development Authority, could not make 30 year loans the plan could not stretch repayment of the Georgia Development Authority loan over a 30 year period. 111 B.R. at 1022. Likewise, in *Foster,* the court concluded that the 30 year proposed repayment term in the plan was not supported by the evidence. 79 B.R. at 911. The creditors, land contract vendors, demonstrated that in contract for deed situations "the normal term is ten to fifteen years, amortized over twenty years, with a balloon payment at ten years." *Foster,* 79 B.R. at 911. Again, in *Smith* the court determined that the "market" supported a shorter term than the plan provided and entered an order requiring a shorter repayment under the plan in accordance with the market standard. 78 B.R. at 494. These cases imply that the term of repayment under § 1225(a)(5)(B)(ii) should be supported by some evidence of reasonableness, customary lender practices, or market standards not simply mathematical present value. *See also* 4 *Collier on Bankruptcy* ¶ 1225.03[b] at 1225–18 (15th Ed.1991) ("<u>Observing that under § 1225(a)(5)(B) "the primary consideration in analyzing the appropriate term for payment of a secured claim is the type of property securing the claim. Under no circumstances should a court permit payment of claim exceeding the customary term for which loans secured by such property are made.</u>").

Id. at 131-32(emphasis added). The *Koch* court concluded that the 30-year repayment term was unreasonable, but permitted amortization over 30 years with a balloon in 15 years based upon the evidence of customary terms. It noted that "the *Collier* treatise, in supporting this type of

-13-

resolution, has observed that courts may prevent an unfair treatment to secured creditors by providing 'for a long-term amortization but to impose a balloon payment at the end of a specified period.'" 4 *Collier on Bankruptcy* ¶ 1225.03[b] at 1225–18 (15th Ed.1991).  The *Koch* court held that this type of resolution was supported by the evidence in that the longest "new loans" in the agricultural lending market in 1991 were 20 years, with that secured lender not making any loans longer than 15 years.

Here, the 30-year time period is unreasonable.  Tri-State is funded by the Farm Credit Bank of Texas (FCBT) and Tri-State is subject to the laws and regulations of the Farm Credit System. Bergsten Declaration at ¶34.  For a Tri-State loan to be eligible to be funded by FCBT the maximum allowed term is 10 years and the maximum allowed amortization is 15 years using a mortgage-style equal monthly payment. *Id.*  That is the maximum customary term for a loan of this type.  Debtor's proposed extension of Tri-State's loan over a 30-year term is just not customary or reasonable.  According to *Collier*, "[u]nder no circumstances should a court permit payment of a claim over a period exceeding the customary term for which loans secured by such property are made." *Collier on Bankruptcy,* ¶1225.03[4][b] at 1225–19 (2010).

The proposed 30-year term is also unreasonable in light of the fact that the original loan was for a one-year term and it matured pre-petition.  "The shorter the original term of the loan, the more scrutiny the court should give to a proposed long-term payout.  A loan originally made for a one-year term should not be subjected to a 30-year amortization except in unusual circumstances." *Id.*; *see also In re Lupfer Bros.*, 120 B.R. 1002 (Bankr.W.D. Mo. 1990)(25-year payment period denied with regard to debt already matured at time of Chapter 12 petition).

Moreover, this court must also consider that Debtor's Plan lacks feasibility in determining whether a 30-year payment term constitutes fair treatment of Tri-State's secured claim.  Debtor's heroic assumptions regarding its future income and expenses, its lack of any cushion in the event of any negative variances, and the omission of significant necessary expenses demonstrate that extending Tri-State's payment term over 30 year is just not reasonable.  Tri-State is at significant risk of its second deed of trust being wiped out through foreclosure if there is a payment default to

-14-

the Class 1(a) creditor, the Paris Family Trust, which is the holder of the first deed of trust; and Tri-State is put in the position of having to cure the default to protect its real property collateral without any remedy against Debtor or the collateral.

Based upon the foregoing, the proposed 30-year term is unreasonable and should not be confirmed.

### 3. The 5.25% Proposed Interest Rate over 30 Years Does Not Provide Tri-State with the Present Value of the Allowed Amount of its Claim as of the Effective Date

The contract rate of interest in provided for in Tri-State's loan is 7.75% per annum. Debtor's Plan seeks to modify the interest rate to 5.25% per annum. Tri-State objects and Debtor will need to invoke the cramdown provisions.

The BAP in *In re Boulders on the River,* 164 B.R. 99, 105 (9th Cir. BAP1994) noted that the Ninth Circuit applies the "formula rate" approach for determining the interest payable on the deferred payment of an obligation under the cramdown. *See also In re Fowler,* 903 F.2d 694, 697 (9th Cir.1990). Under this approach the court starts with a base rate and adds a risk factor based on the risk of default and the nature of the security. *Boulders on the River,* 164 B.R. at 105; *In re Fowler,* 903 F.2d at 697. The interest rate determination is to be made on a case-by-case basis. *Boulders on the River,* 164 B.R. at 105.

The Supreme Court addressed the calculation of present value interest under § 1325(a)(5)(B)(ii) in *Till v. SCS Credit Corp.,* 541 U.S. 465, 479-80, 484-85, 124 S.Ct. 1951, 1961-62, 1964-65, 158 L.Ed.2d 787 (2004) (plurality opinion), and set "prime plus" or the formula rate as the proper method for determining the interest rate that would provide present value. As noted in *Wells Fargo Bank NW, N.A. v. Yett (In re Yett),* 306 B.R. 287, 290-91 (9th Cir.BAP 2004) and given the same phraseology of "value, as of the effective date of the plan," the cramdown interest rate should be determined the same way in Chapter 11, 12, and 13 cases.

A contract rate of interest may be evidence of the proper rate for a plan, but it is not conclusive. In *Till*, the Supreme Court held that it is the debtor's evidentiary burden to establish the prime rate for the type of loan and it is the creditor's evidentiary burden to present evidence of a higher interest rate (the portion associated with the risk factor). *Till,* 541 U.S. at 479, 124 S.Ct. at 1961.

Here, Debtor has wholly failed to establish that 5.25% is a "prime plus" rate that would provide present value to Tri-State. Further, as set forth in the Bergsten Declaration, this is not a

-15-

**LAW OFFICES OF AMY N. TIRRE**
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 828-0909 Telephone
(775) 828-0914 Facsimile
E-mail: amy@amytirrelaw.com

commercially reasonable rate for a 30-year loan with the risks involved in this case. As set forth in Exhibit 10, attached to the Bergsten Declaration, Mr. Steve Hilsabeck, Vice President of FCBT, identifies the appropriate interest rate for a 30-year loan with these risk characteristics. The current cost rate is 3.75% for farm loans and the appropriate added spread in light of the risks and the nature of the collateral is to 5% to 6% for a interest rate of 8.75% to 9.75%. Bergsten Declaration at ¶35.

### D. TRI-STATE IS NOT ADEQUATELY PROTECTED UNDER DEBTOR'S PLAN

#### 1. Tri-State Lacks Adequate Protection for Debtor's Use of Tri-State's Personal Property Collateral

Tri-State has a first-priority security interest in all of Debtor's personal property assets, including its livestock (sheep remain, no cattle), hay, leases, AUM's, and equipment. Debtor estimates the value of its personal property, primarily livestock, to be $700,000. However, this value is subject to significant depreciation because the sheep herd could decline through birthing losses and death. During the first three years of the Plan, Debtor proposes to generate income from Tri-State's collateral without a single payment to Tri-State. Tri-State is not adequately protected by Debtor's proposal to continue use of Tri-State's collateral without making any payments to Tri-State. *See* 11 U.S.C. §1205 (defining adequate protection in Chapter 12); 11 U.S.C. §1325(a)(5)(B)(iii)(ii)(requiring adequate protection for use of secured creditor's personal property collateral during term of Chapter 13 plan). According to *Collier*, there are significant concerns when a loan is secured by livestock and a debtor proposes to amortize payments over a long period of time:

> Livestock will be bought and sold during the period of the plan and is subject to drastic and sudden changes in value. Changes in value can arise in three ways: increases or decreases in the animals comprising the herd, changes in market prices of the livestock, and the risk of loss from disease or inadequate care. In considering the appropriate payment schedule for a claim secured by livestock, all of these potential changes in the value of the herd must be addressed. In order to protect the creditor's interest in the herd and to make sure that the creditor is receiving the present value of its claim, the plan must contain the same types of safeguards customarily contained in livestock loans.
>
> The debtor should be required to maintain the herd at a minimum level. The plan

> should specify the terms under which livestock can be sold and provide for prior notice to the creditor of certain types of sales. The creditor should receive frequent and detailed reports on the operation and have the right to inspect the herd. Most important of all, perhaps, is a requirement that the debtor maintain any margin or equity cushion that exists on the effective date of the plan. That margin is likely to be the creditor's greatest protection against loss during the plan period. Finally, in conducting the feasibility analysis required by section 1225(a)(6), the court should scrutinize the proposed postconfirmation plan with extra caution in light of the tremendous risk posed to the secured creditor from the debtor's continued operation.

4 *Collier on Bankruptcy*, ¶ 1225.03[4][b][iii] at 1225–18-19 (2010).

Here, Debtor's Plan fails to provide any safeguards to Tri-State by, e.g., maintaining the herd at a minimum level, specifying the terms under which livestock can be sold, providing notice to Tri-State before sales, providing frequent and detailed reports on the operation to Tri-State, verifying Tri-State's right to inspect the herd in April each year, providing Tri-State with tax returns. Bergsten Declaration at ¶¶36-40.

Moreover, there is no equity cushion that exists as of the effective date of the plan. Tri-State's claim is almost $2 million and the herd is worth $700,000 according to Debtor so Tri-State is undersecured with respect to its livestock collateral. As detailed in above and in the Bergsten Declaration, there are significant concerns about feasibility and credibility and therefore, Tri-State is not adequately protected.

### 2. Tri-State is not Adequately Protected in the Event of Debtor's Default Upon a Payment Due to the First Deed of Trust Holder

Tri-State holds a second deed of trust against Debtor's real property. Tri-State is not adequately protected in the event that Debtor fails to make its annual payment to the Class 1(a) creditor, which holds a first deed of trust against the real property. If such a default occurs, Tri-State will be in a position where it must cure the default and make the payment to the Class 1(a) creditor in order to prevent a foreclosure under the first deed of trust and preserve Tri-State's second deed of trust. Bergsten Declaration at ¶41. Tri-State must be able to declare a default under its own deed of trust in the event of Debtor's default on the payment to the Class 1(a) creditor. Otherwise, Debtor would be putting Tri-State at risk of losing its real property collateral without giving Tri-State any remedy. Debtor's Plan should not be confirmed unless such a provision is included to protect Tri-State.

-17-

LAW OFFICES OF AMY N. TIRRE
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 828-0909 Telephone
(775) 828-0914 Facsimile
E-mail: amy@amytirrelaw.com

## V. CONCLUSION

Debtor's Chapter 12 Plan should not be confirmed because: (1) Debtor is ineligible for relief under Chapter 12 because its debts exceed the debt limit of $3,792,650 as required by 11 U.S.C. §101(18)(B); (2) Debtor's Chapter 12 Plan is not feasible as required by 11 U.S.C. §1225(a)(6); (3) the proposed treatment of Tri-State's secured claim does not comport with the requirements of 11 U.S.C. §1225(a)(5)(B) on the grounds that it, inter alia, extends a fully-matured 1-year term loan for 30 years, which is unreasonable and it provides for negative amortization over the first two years; and the proposed cramdown interest rate does not adequately compensate Tri-State as required by 11 U.S.C. §1225(a)(5)(B)(ii); and (4) Tri-State is not being adequately protected because Debtor proposes to use of its personal property collateral during the term of the plan and beyond without any payment to Tri-State for the first two years; and because Tri-State's second deed of trust may be foreclosed out in the event of Debtor's payment default to the Class 1(a) creditor, which holds a first deed of trust against the real property, and Tri-State has no remedy.

LAW OFFICES OF AMY N. TIRRE, APC

By: /s/ Amy N. Tirre
AMY N. TIRRE, ESQ.

Counsel for Tri-State Livestock Credit Corporation

**LAW OFFICES OF AMY N. TIRRE**
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 828-0909 Telephone
(775) 828-0914 Facsimile
E-mail: amy@amytirrelaw.com

**CERTIFICATE OF SERVICE**

Pursuant to FRBP 7005 and FRCP 5(b), I certify that I am an employee of Law Offices of Amy N. Tirre, that I am over the age of 18 and not a party to the above-referenced case, and that on November 7, 2011 I filed the **TRI-STATE CREDIT CORPORATION'S OBJECTION TO DEBTOR'S CHAPTER 12 PLAN** as indicated:

__x__    **BY NOTICE OF ELECTRONIC FILING**: through Electronic Case Filing System of the United States Bankruptcy Court, District of Nevada, to the individuals and/or entities at their email addresses as set forth below:

- M NELSON ENMARK    nenmark.trustee@gmail.com
- MICHAEL LEHNERS    michaellehners@yahoo.com
- KAARAN E. THOMAS    kthomas@mcdonaldcarano.com, mmorton@mcdonaldcarano.com
- JOHN WHITE    bankruptcy@whitelawchartered.com, john@whitelawchartered.com;jen@whitelawchartered.com

_____    **BY HAND DELIVERY VIA COURIER**: by causing hand delivery of the Document listed above via Reno Carson Messenger Service to the persons at the addresses set forth below.

_____    **BY MAIL**: by placing the document listed above in a sealed envelope with Postage thereon fully prepaid in the United States Mail at Reno, Nevada, and addressed as set forth below. I am readily familiar with my office's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on 7 November 2011, with postage thereon fully prepaid in the ordinary course of business.

DATED this November 7, 2011.

                    /s/ Andrea Black
                  An Employee of Law Offices of Amy N. Tirre

LAW OFFICES OF AMY N. TIRRE
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 828-0909 Telephone
(775) 828-0914 Facsimile
E-mail: amy@amytirrelaw.com